*785 OPINION.
GreeN:
The broad question presented in these proceedings is the amount of the gain resulting from the disposition by the several petitioners during 1920 of all their stocks and bonds in the old companies for cash and bonds in the new company. This question may be conveniently divided into three subquestions: (1) What is the basis for determining gain or loss under section 202 of the Revenue Act of 1918 in those cases where the property disposed of in 1920 *786 had been inherited by the person making the disposition or was owned by an estate? (2) Did the transaction by virtue of which the petitioners disposed of their capital stock in the old companies and acquired the bonds of the new company constitute a sale within the meaning of section 202(a) of the Eevenue Act of 1918, or an exchange in connection with a reorganization, merger or consolidation as provided in section 202(b) of the same Act? (3) What was the fair market price or value of the securities of the old companies on the various basic dates?
The first subquestion has already been decided by us in the Appeal of Dorothy Payne Whitney Straight, Executrix, 7 B. T. A 177. See also Bankers' Trust Co. v. Bowers, 23 Fed. (2d) 941. It follows that the basis for determining gain or loss in those cases where the property disposed of in 1920 had been inherited by the person making the disposition or was owned by an estate, and where the decedent died subsequent to February 28, 1913, is the value of the property at the date of the decedent’s death rather than the cost to the decedent. See also Charles G. Barnes et al., Executors, v. Commissioner, 8 B. T. A. 360, and Walter R. McCarthy, Executor, v. Commissioner, 9 B. T. A. 525. Cf. Matthiessen v. United States (Ct. Cls.) 6 Am. Fed. Tax Rep. 7105. If, however, the death occurred prior to March 1, 1913, the basis for determining-gain would be the value on the date of death or on March 1, 1913, whichever is higher, and the basis for determining loss would be the value on the date of death or on March 1, 1913, whichever is lower. Goodrich v. Edwards, 255 U. S. 527; Walsh v. Brewster, 255 U. S. 536; United States v. Flannery, 268 U. S. 98; McCaughn v. Ludington, 268 U. S. 106.
The second subquestion is to determine whether the disposition of the stocks of the old companies in 1920 by the several petitioners for bonds of the new company comes within the provisions of section 202(a) of the Eevenue Act of 1918 or section 202(b) thereof. This section is quoted in full, as follows:
Sec. 202. (a) That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—
(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that dat-e; and
(2) In the ease of property acquired on or after that date, the cost thereof; or the inventory value, if the inventory is made in accordance with section 203.
(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities *787 received shall be treated as taking tlio place of the stock, securities, or property exchanged.
When in the case of any such reorganization, merger or consolidation the aggregate par or face value of the new stock or securities received is in excess of the aggregate par or face value of the stock or securities exchanged, a like amount in par or face value of tlio new stock or securities received shall be treated as taking the place of the stock or securities exchanged, and the amount of the excess in par or face value shall be treated as a gain to the extent that the fair market value of the new stock or securities is greater than the cost (or if acquired prior to March 1, 1913, the fair market value as of that date) of the stock or securities exchanged.
The petitioners contend that the disposition of the stocks in question comes within section 202(b), whereas the respondent contends that such disposition comes within section 202(a). The respondent originally in Docket Nos. 3799, 3858, and 6208 made his determinations, as evidenced by his deficiency letters, upon the theory that the transaction came within section 202(b). In his original answer as a proposition of law, he stated that, “ The exchange of common and preferred stock of a predecessor company or companies for bonds of a successor company, pursuant to a reorganization, constitutes a closed transaction for income tax purposes, the taxable gain from which is to be measured in this case in accordance with ” section 202(b) of the Revenue Act of 1918. Subsequently, however, he obtained leave to file amended answers in which he alleged as an affirmative defense that the petitioners “ sold and exchanged ” their stocks in the old companies for bonds of the new and that this exchange was not made pursuant to or in connection with a reorganization, merger, or consolidation. In the remaining four cases the deficiencies determined by the respondent were upon the theory that the exchange in 1920 of stocks of the Railroad Company and of the Rockhill Company for bonds of the Rockhill Coal Co. was not in connection with a reorganization, merger and consolidation under section 202(b) but was taxable under section 202(a).
The respondent argues that the petitioners can not bo said to have “ exchanged ” their stock in the old companies for bonds of the new “ in connection with the reorganization, merger, or consolidation of a corporation,” for the reason that the petitioners changed their status entirely ívith respect to the business being conducted by the old companies from that of owners, namely, stockholders and bondholders to that of creditors, namely, bondholders only; that all the petitioners did was to “ sell ” their stock in the old companies in consideration for bonds in the new; that the Gilbert agreement should be held to control the question here involved; and that the Shantung agreements were only drawn to lend color to the entire transaction.
*788 We do not agree with the respondent in any of his contentions on this point. There is no evidence whatever in the record that would tend to show in the least that any of the agreements referred to in our findings of fact were anything else than bona fide. In our opinion a proper determination of this question depends upon a consideration of all four agreements rather than any particular one to the exclusion of the others. But even if we were to decide the question on the basis of the Gilbert agreement alone we could not sustain the respondent’s contention. This agreement clearly was not a sale in praesenti. At best it was no more than an agreement to either purchase or exchange at some future time provided Roberts was successful in obtaining “ for purchase by the Purchaser hereunder, or for exchange for the bonds or preferred stock of the new company hereafter referred to, on or prior to March 15, 1920,” 95 per cent of the capital stock and bonds of each of the old companies. Paragraph three of the Gilbert agreement clearly indicates that at that time there was contemplated a “ proposed reorganization, merger and consolidation.” The purpose of the “ agreement to merge,” which was entered into on the same day as the Gilbert agreement, was “ to define certain of the respective rights and obligations of the parties in connection with the transaction * * * contemplated ” in the Gilbert agreement. After setting forth certain of such rights and obligations the “ agreement to merge ” provided that:
A merger and consolidation will tlien be effected between the Shantung Coal Company and the Roekhill Iron and Coal Company merging and consolidating said companies into a new company to be known as Roekhill Coal and Iron Company * * *.
On March 15, 1920, an agreement of merger and consolidation was entered into between the Shantung Coal Co. and the Roekhill Company, whereby and pursuant to which it was provided that upon the due approval thereof by the stockholders of each of said corporations and on the filing of such agreement or copy thereof and the certificate of the secretary of each of said corporations ratifying the approval of this agreement by the stockholders of the corporation of which he was an officer, in the office of the Secretary of the Commonwealth of Pennsylvania and elsewhere as required by law, the said corporations should be deemed and taken to be one corporation. Thereafter the stockholders of both companies unanimously approved, ratified and confirmed the said merger agreement, which was duly executed and filed as provided by law, and, as a result thereof, on March 16,1920, letters patent signed by the Governor and the Secretary, respectively, of the Commonwealth of Pennsylvania, were issued to the new company, namely, the Roekhill Coal & Iron Co. Also as a result of the option to either sell or exchange con *789 tained in the Gilbert agreement, at least 223 holders of stock of the old companies agreed (referred to in the findings as the Shantung agreements) “ to exchange ” their stock in the old companies for bonds “ of the reorganized, merged and consolidated Rockhill -Coal and Iron Company.” As set out in our findings of fact, all of the petitioners exchanged all of their stocks in the old companies for bonds of the uew.
The words “ reorganization, merger, or consolidation ” as used in section 202(b), supra, are not defined in the Act. But .giving to such words their ordinary meaning, we are clearly of the opinion that what happened between February 7 and March 16, 1920, as set; forth above, as far as the old Rockhill Company was concerned, amounted to a “ reorganization, merger or consolidation ” within the meaning of those terms as used in section 202(b). See Appeal of R. D. Musser, 2 B. T. A. 1031; Appeal of A. J. Siegel, 4 B. T. A. 186, and John B. Atkins v. Commissioner, 9 B. T. A. 140.
The situation is not precisely the same in the case of the exchange of the stock of these petitioners in the East Broad Top Railroad & Coal Co. for the bonds of the new company, namely the Rockhill Coal & Iron Co. So far as the petitioners were concerned, the transaction took exactly the same course, an exchange of stock for bonds, but the plan of reorganization did not contemplate that upon the acquisition by the new Rockhill Company of all of the oustanding stock and bonds of the Railroad Company, the latter would be merged into the former as was the plan in the case of the old Rockhill Company. It was contemplated that while the new Rockhill Company should own all of the securities of the Railroad Company, still the identity of the Railroad Company should be maintained and its assets should not be transferred to the new company. We are therefore called upon to determine whether such a transaction may be classed as “ a reorganization, merger, or consolidation.”
The Commissioner’s regulations relative to the statute here under consideration would seem to include this transaction within the provisions of the statute. Article 1567, in part, reads as follows:
Art. 1567. Exchange of stoelc for other stoelc of no greater par value. — In general, where two (or more) corporations unite their properties, by either (a) the dissolution of corporation B and the sale of its assets to corporation A, or (6) the sale of its property by B to A and the dissolution of B, or (o) the sale of the stock of B to A and the dissolution of B, or (d) the merger of B into A, or (e) the consolidation of the corporations, no taxable income is received from the transaction by A or B or the stockholders of either, provided the sole consideration received by B and its stockholders in (a), (6), (o), and (d) is stock or securities of A, and by A and B and their stockholders in (e) is stock or securities of the consolidated corporation, in any case of no greater aggregate par or face value than the old stock and securities surrendered. The term “ reorganization,” as used in section 202 of the statute, includes cases of *790 corporate readjustment where stockholders exchange their stock for the stock of a holding corporation, provided the holding corporation and the original corporation, in which it holds stock, are so closely related that the two corporations are affiliated as defined in section 240(b) of the statute and article 633, and are thus required to file consolidated returns.
Article 1569 reads as follows:
Akt. 1569. Exchange of stock; for other stock of greater par while. — If in the case of any reorganization, merger, or consolidation the aggregate par or face value of the new stock or securities received is in excess of the aggregate par or face value of the stock and securities exchanged, income will be realized from the transaction by the recipients of the new stock or securities to an amount limited by (a) the excess of the par or face value of the new stock or securities over the par or face value of the old and (5) the excess of the fair market value of the new stock or securities over the cost or fair market value as of March 1, 1913, of the old. In other words, the taxable profit will be (a) or (5), whichever is less. Upon a subsequent sale of the new stock or securities their cost to the taxpayer will be the cost or fair market value as of March 1, 1913, of the old stock and securities, plus the profit taxed on the exchange.
One of the pertinent provisions of the Gilbert agreement was that Gilbert was under no obligation to acquire from Roberts the stocks and bonds of the old Rockhill Company and the stocks and bonds of the Railroad Company unless Roberts was able to deliver to him at least 95 per cent of each class of security in each corporation. This agreement was carried out and through the various agreements,the new Rockhill Company came into possession of at least 95 per cent of the stock and bonds of the Railroad Company and the corporations were consequently affiliated within the meaning of that term as used in the Revenue Act of 1918. This being true, the transaction falls squarely within the last quoted sentence of article 1567.
This transaction differs from the one relating to the stocks and bonds of the old Rockhill Company only in that subsequent to the acquisition of the stocks and bonds of the Railroad Company, its assets were not transferred to the new Rockhill Company. The ownership and control of these assets for all practical purposes were vested as completely in the new Rockhill Company as if there had been an actual transfer of the assets. Likewise the beneficial interest of the stockholders of the new Rockhill Company would be, for all practical purposes, the same whether the companies were actually merged or not. At any time it was within the power of the new Rockhill Company to transfer the assets of the Railroad Company to itself and either continue the Railroad Company in existence or liquidate it as it saw fit. The plan adopted contemplated the acquisition of the stocks of both companies with the ultimate control of the assets of both vested in the new corporation, and the acquisition of the stocks and bonds of each of the corporations was equally important. We, therefore, conclude that the exchange of securities *791 of the Railroad Company for securities of the new Rockhill Company was an exchange in connection with a reorganization, merger, or consolidation, and that the gain or loss resulting therefrom should be computed as to these securities in the same manner as it should be computed on the stocks of the old Rockhill Company.
We, therefore, hold that the bonds of the new Rockhill Company received by the stockholders of the old Rockhill Company and the Railroad Company in place of their stocks in the old companies, were received by them “ in connection with the reorganization, merger, or consolidation of a corporation,” and since the aggregate par or face value of the new securities was in excess of the aggregate par or face value of the stock exchanged, the gain, if any, should be computed in accordance with the last paragraph of section 202(b) of the Revenue Act of 1918.
What was the fair market price or value of the securities of the old companies on the various basic dates?
Based upon our decision regarding the first two subissues as set out above, a proper determination of gain or loss in the disposition of the various securities in 1920 requires findings of fact as to the fair market price or value, and/or cost of such securities on the following dates:
[[Image here]]
SHADE GAP RAILROAD CO.
Bonds
Value...June 11,1914
Value. 1889
Value — ....... Mar, 1,1913
Value — . 1893
Value....-.... 1892
*792 The respondent on page 18 of his brief “admits error in using March 1, 1918, as a' basic date, a position of necessity taken by him on the nonproduction of facts and proof of any other basic date, but submits that petitioners have not proven values in excess of those allowed by him as of March 1, 1913.” He determined that the March 1, 1913, value of all the first-mortgage bonds was 60 per cent of par; of all the second-mortgage bonds, 40 per cent; and of all the stock, both common and preferred, of all companies, $10 per share. In 1920 all the bonds were redeemed at par plus accrued interest, and all the stock of the petitioners was exchanged for bonds of the new company having a fair market value of 96 per cent of par. It is, therefore, apparent at the outset that in all those cases where the securities disposed of in 1920 were acquired subsequent to March 1, 1913, the respondent is wrong in principle in comparing with the selling price an alleged March 1, 1913, value thereof. It is also apparent that he has also committed error in those cases where the securities disposed of were acquired prior to March 1, 1913, and the cost or acquisition value was in excess of the March 1, 1913, value determined by him. Goodrich v. Edwards, supra; Walsh v. Brewster, supra. The petitioners contend that on March 1, 1913, there had been established no fair market price on any of the securities and that, taking into consideration all of the evidence, the fair market value of all of the securities on that date was at least equal to the cost or acquisition value.
Between 1873 and 1877, George B. Maride, Sr., as an original investor, purchased for cash and/or its equivalent 2,024 shares of the common stock of the Railroad Company at an average price of $41.277 per share and 4,167 shares of the common stock of the Rock-hill Company at an average price of $47.45 per share. He also purchased between those dates $100,000 par value of the Railroad Company first-mortgage bonds for $90,000 and $80,000 par value of the Rockhill Company first-mortgage bonds for $72,000, both purchases of bonds being at 90 per cent of par. In 1883 he accepted as payment of interest on the first-mortgage bonds of both companies, then due and in default, 1,008 shares of preferred stock of the Railroad Company at $50 par value per share and 879 shares of preferred stock of the Rockhill Company at $50 par value per share. He died August 18, 1888. In accordance with his will part of the above securities passed to his heirs, the remaining petitioners herein, in 1889 and 1892 and 1893, and part was still held by his estate at the time all of the securities were disposed of in 1920. In 1909 the petitioners accepted as payment of interest on the first-mortgage bonds of both companies then due and in default, second-mortgage bonds of both companies at par. The petitioners contend that the original cost of the preferred stocks and second-mortgage bonds taken in *793 payment of liabilities owing to them should be found to be the par value of such stocks and bonds. The relationship between a corporation which has mortgaged its properties and its bondholders is that of debtor and creditor. The result of accepting preferred stock or second-mortgage bonds in payment of interest is in effect the same as if the corporation had paid its first-mortgage bondholders cash and they in turn purchased with that cash preferred stock and second-mortgage bonds in the corporation at par. In Veeder v. Mudgett, 95 N. Y. 295, 315, cei’tain creditors were attempting to enforce liability upon the stockholders of a corporation in receivership on the ground that they had not fully paid for their stock under a statute providing for payment of capital stock in money. The court said:
So far as tlie stock was issued for property bought of Whitney and French, no question is here raised, but as to Jones it is said the turn made of the debt due to him from the company for work in constructing its furnaces was not a payment of money upon the capital stock within the meaning of section 14 of the act of 1848. If the company had paid the money to Jones in discharge of the debt due him, and then Jones had handed back the same money as a payment upon his stock, no question could have arisen. Precisely that was the substance of the transaction, although the form of passing the money was omitted. We think the payment was sufficient.
We do not find from the evidence that at the time the securities were inherited in 1889, 1892, and 1893, the securities had depreciated any in value from the original cost price of such securities.
The question now remains as to what was the fair market value of all the securities on March 1, 1913, and June 11, 1914, and of the second-mortgage bonds of both companies and the common stock of the Railroad Company on June 30, 1915. There were no actual sales of any consequence on or about those dates. The petitioners argue that for this reason and the fact that the stocks of both companies were closely held there is nothing in the record to justify a finding that the stocks and bonds on March 1, 1913, June 11, 1914, and June 30, 1915, were worth less than was originally paid for them, since the intrinsic value of the assets and the book values of such securities were equal to at least the original cost thereof. They cite Appeal of Grant Trust & Savings Co., Trustee, 3 B. T. A. 1026, in which, at page 1029, we said:
In the valuation of closely held stock the book value must serve as a basis, if the result, as stated by one court, is to be anything more than a “ dignified guess.” In In re Dupignae’s Estate, 204 N. Y. S. 273, 279, the court stated the following basis for valuing closely held securities:
“ The method adopted by the courts in arriving at the fair or clear market value of closely held securities is sound. It is to value the corporate assets in the manner that a buyer would value them; to ascertain the cash value of the property which the shares represent, assigning to each share its proportionate worth. The book value of stock is its intrinsic value. If there have been no *794 sales, the assessor must necessarily fail back upon the book value as the nearest approximation to the fair market value. In the absence of sales, the book value must be taken as the basis of computation. Any other rule would be illogical, and create an impotent conclusion. The use of the words “ fair market,” or “clear market” value, when applied to closely held stock, is meaningless. Because there is no market to guide, such stock must be appraised at its value in money — its intrinsic worth. It can only be compared and measured in money value, according to the assets as shown by the balance sheet, less liabilities. The assets of the balance sheet is the inventory value. Authorities in abundance support this method. [Citing cases.] The method adopted in these cases has been followed in Matter of Felton, 176 Cal. 663, 169 Pac. 392.”
We do not think that the book values of the stocks are controlling in the instant case. On March 1, 1913, there was outstanding a written option in which the stockholders were willing to sell their stocks at $10 per share. They were also offered a flat cash price which, while netting the bondholders par plus accrued interest, would not have assured to stockholders anything over the $10, if that. One of the officers of the Railroad Company (C. D. Jones) testified on cross-examination that he did not consider the $10 a fair market value at that time but, as all the stockholders were willing to sell at that price, we do not consider Mr. Jones’ testimony as convincing that the fair market value of the stocks on March 1, 1913, was any more than the price at which all were willing to sell. The record shows that the stock was held by financially strong people generally, so that the offer to sell at $10 could not be considered a forced offer on their part. Part of Mr. Jones’ testimony referred to above is as follows:
Q. You are familiar with the agreement of September 1913, are you?
A. That is — somewhat familiar.
Q. Wherein the stockholders agreed to sell that stock for $10 a share?
A. Yes.
Q. At that time you considered that a fair market value, did'you not?
A. No.
Q. You- did not consider that a fair market value?
A. No.
Q. You were willing to sell it for much less?
A. Sell it for less?
Q. Yes; than the market value.
A. Oh, not to sell it for less.
Q. You were willing to sell it for $10 a share?
A. Well, perhaps I agreed to do it at that time, but I didn’t think it was right — didn’t think it was a fair value.
Q. But you agreed to do it? You, as a stockholder, agreed to sell it at $10?
A. Possibly I did. I don’t recall it.
Q. Under the agreement of that time, when the option expired, ■ you, together with the rest of the stockholders, left that stock in the hands of a trustee, pending negotiations for the sale to other banks or other purchasers at $10 a share?
A. Yes.
*795 Q. And at that time, March 1, 1913, you were willing to sell your stock for $10 a share?
A. I think, perhaps, I would have gone along with the rest at that time, whether I thought that was the right thing to do or not.
Q. Of course, knowing what has happened since that time, you would not have been willing to sell?
A. Sure not. I say, I would have been willing to go along at that time, whether I thought it was the right thing to do or not. 'Sometimes we do those things under a combination of circumstances.
Q. You had never received any dividends on that stock, which you owned, prior to March 1st, 1913?
A. Prior to that, no.
Q. No return at all from the capital invested in those stocks?
A. No; put right back into the property.
With respect to the fair market value of the bonds on March 1, 1913, we think the record clearly supports a finding of at least par value for both the first and second-mortgage' bonds of both companies, and we so find.
The petitioners concede in their brief that the findings as to March 1, 1913, may also be said to apply to the dates of June 11, 1914, and June 30,1915. We are, therefore, of the opinion that the fair market value of both the common and preferred stocks of both companies on March 1, 1913, and June 11, 1914, was not in excess of $10 per share; that the fair market value of both the first and second-mortgage bonds on those dates was par; that the fair market value of the common stock of the Railroad Company on June 30, 1915, was not in excess of $10 per share; and that the fair market value of the second-mortgage bonds on June 30, 1915, was par.
In Docket No. 6208, there is no evidence as to the cost of the 55 shares of preferred stock of the Rock Hill Company purchased in 1908 or the $5,000 par value first-mortgage bonds of the Rockhill Company purchased in 1909. Also, in Docket No. 17698, there is no evidence as to the cost of the 82 shares of the common stock of the Rockhill Company purchased in 1874. In those three computations of gain or loss one of the factors necessary for an accurate determination is missing. But we have here only the question of gain, and since the establishment of cost could in any event only tend to reduce the amount of gain, we believe the computation should be made by comparing the established March 1, 1913, values and selling prices. Appeal of Gilbert Butler, 4 B. T. A. 756, 762.
The deficiencies should be redetermined in accordance with the foregoing.
Reviewed by the Board.

Judgment will be entered on %0 days’ notice, under Bule 50.

Aeundell and Milliken did not participate.